Casey, C. J.,
delivered the opinion of the court:
Some days prior to the first of March, 1865, the Secretary of Wax-made a call upon the Quartermaster General for a statement of the number of claimant’s patent knapsack and infantry accoutrements that had been purchased by the United States and issued to the troops. On the day named the Quartermaster General made return as follows :

¡Statement of purchases and, issues of Mann’s patent knapsack by the quartermasters' department.

*407

Upon the receipt of this statement the following order was issued to the Quartermaster General by the Assistant Secretary of War :
“ Returned to the Quartermaster General, with directions to make a contract with Mr. Mann to complete the 5,000 sets of his patent infantry accoutrements ordered by the ordnance department on January 4, 1865.
“By order of the Secretary of War :
“C. A. Dana,
“ Assistant Secretary of War.
“War Department, March 3, 1865.”
Thereupon the Quartermaster-General issued the following order to General Vinton, the deputy quartermaster general at New York city :
“Quartermaster General’s Office,
“ Washington, D. C., March 14, 1865.
“General : The Quartermaster General directs that you purchase, under contract, of W. D. Mann, patentee, five thousand, (5,000) additional knapsacks and straps, (Mann’s patent,) in order to complete the 5,000 sets of his patent accoutrements ordered by the ordnance department January 4, 1S65.
“Very respectfully, your obedient servant,
“By order of the Quartermaster General:
“Alex. J. Perry.”
Upon receipt of this order General Vinton sent the following :
“ Office of Army'Clothing and Equipage,
‘‘New York, March 18, 1865.
“ Sir : Please deliver at this depot, subject to inspection, for and on account of the United States, five thousand (5,000) of Mann’s patent knapsacks complete, at two dollars and eighty-five and a half cents *408 (‡2 85J) each, to be delivered at once. The contracts will he ready for signature on Monday next.
“Very respectfully, your obedient servant,
‘‘ By order of
“D. H. Vinton,
“ Bvt. Brig. Gen., Dep. Q. M. G.
“ Mr. W. D. Mann, 240 Broadway, New York."
The written contract is dated the same day, and signed by Captain Darrow, assistant quartermaster, on behalf of the United States, and by the claimant. A bond, with sureties, for the faithfuf performance, was given by the claimant.
The written contract provides that all the knapsacks are to be completed and delivered within forty days from its date,'subject to inspection. It also provides that on failure to deliver within the specified time the United States may purchase the articles in open market at the expense of the claimant.
, On the 23d day of March, 1865, the claimant delivered at the government depot of army clothing and equipage in the city of New York, the place designated in the contract as the point of delivery and inspection. He was proceeding with the fulfilment of the remaining, part of his contract, when the following proceedings took place :
“QUARTERMASTER GENERAL’S OEFICE,
“ Washington, D. C., March 20, 1865.
“ Sir : It is reported to me that two or three thousand of Mann’s patent knapsacks were issued to the army of the Potomac, and that, after being in use two or three weeks, all have been turned in again to the quartermasters’ department; that there are about 12,000 at City Point, and they have been ordered back to Washington. The official papers have not been received at this office, but as large orders for the knapsacks were given, and as lately I was ordered to cause still further contracts to be made, I submit this information at the earliest moment for such as may be proper.
“ I am, very respectfully, your obedient servant,
“ M. C. Meigs,
„ “ Brevet Major General, Quartermasters' Department.
“ Hon. E. M. Stanton,

“Secretary of War, Washington, D. C.”

“ Beturned to the Quartermaster General to suspend the making of any new contract for Mann’s patent knapsacks until the facts herein *409 stated can be ascertained, and until it can be learned whether the knapsacks prove useless in actual service in the field.
“ C. A. Dana,

“Assistant .Secretary of War.

“•WaR DEPARTMENT, March 21, 1865.”
[By telegraph. ]
“Quartermaster General’s Office,
“ Washington, D. G., March 25, 1865.
“ The order from this office of March 14th, relative to the purchase of Mann’s patent knapsacks, is countermanded until further notice.
“ By order of Quartermaster General:
“Alex. J. Perry,

“Colonel, Quartermasters' Department.

“Brigadier General D. H. Vinton,
“ Deputy Quartermaster General, New Yorlc.”
“ Office of Army Clothing and Equipage,
“New Yorlc, March 27, 1865.
“ Sir : General Yinton has directed me to inform you that, in pursuance of instructions, this day received from the Quartermaster General, the contract for knapsacks entered into with you on the 18th instant is hereby countermanded until further notice.
“ Very respectfully, your obedient servant,
“ H. Vinton, Chief Cleric.
“Mr. W. D. Mann, 240 Broadway, New Yorlc.”
The notification of this order to the claimant, or his agent, was upon the 29th or 30th of March, 1865. At that time 1,000 of the knapsacks had been completed, and delivered at the place appointed in the contract. The material for the remaining 4,000 had all been purchased and “ cut out,” and their manufacture was far advanced when this order countermanding the contract was received. The material was useless for any other purpose. For the knapsacks there was no purchaser besides the United States. They were all completed and tendered to the officers of the United States at the place designated in the contract before the expiration of the time specified in the agreement. Inspection of the knapsacks was demanded, and vouchers for their delivery and receipt requested. But under the orders above recited this was refused.
The claimant alleged that, having performed his part of the contract *410 by making and delivering, or offering to delivei, the knapsacks, according to its terms, he was entitled to recover the contract price.
The defendant’s solicitor did not controvert the facts upon which the claim is founded,.but alleged that the claimant had transferred and assigned his contract, and that the same was thereby rendered null and void under the provisions of the 14th section, act 17 July, 1862, (12 Stat. L., p. 596 ; 2 Bright. Dig , p. 94; D , 9,) which provides that “ no contract or order, or auy interest therein, shall be transferred by the party or parties to whom such contract or order may be given, to any other party or parties; and auy such transfer shall cause the annulment of the contract or order transferred, so far'as the United States are concerned.” But the evidence does not sustain the allegation of any such transfer, but especially disproves it. And therefore the question raised and discussed by the solicitors does not arise in the cause.
When the case was first tried and submitted there was no proof in the record of the value of the knapsacks at this time, or at the date of refusal to receive them, in the market. We were of opinion that the true measure of damages for refusing to receive the knapsacks and pay for them was not the price fixed in the contract; but that it was the amount stipulated in the contract, less the value of the knapsacks to the claimant, or in the market, irrespective of the United States. There being no evidence to show what that value was, we sent the case back to have that omission supplied. A number of witnesses have been examined on that subject, and the evidence shows that from 'the great number thrown upon the market within the past three years, both by the government and dealers, and the lack of any demand, they have a mere nominal value. The prices in the market have varied from four to ten cents apiece. A fair average we consider about six cents. This sum, as the present market value of the articles, is therefore to be deducted from the price agreed to be paid for the knapsacks, and the difference, if we find for the claimant, is, as we consider, the true measure of damage.
We are satisfied that the refusal to receive and pay for the knap sacks according to the contract arose from a misapprehension of the extent and character of the order of the- Secretary of War. That was intended to prevent the making of any new contracts, and not the annulment of those in existence. It says expressly : “ the Quartermaster General to suspend the making of any new contracts for Mann’s patent knapsacks until the facts herein stated can be ascertained.” There was nothing in this language which authorized the Quar *411 termas ter General’s office to repudiate a contract already complete and consummate. Nor would it change the legal effect of the attempted annulment if it bad. We have many times decided that, when the .United States, through their duly authorized agents and officers, enter into contract arrangements and stipulations with their citizens, in matters pertaining to the public service, and in the mode provided by law, that they, ¶7-0 hac vice, relinquish their sovereign character, and subject -themselves to those rules of justice and right which all just governments administer and enforce between man and man; and that for any breach or failure to fulfil the stipulations, and discharge the obligations thus assumed, without tiny neglect or fault on the other side, the party injured by such default has the same just right to he compensated for the loss he has sustained as if the contract had been with an individual.
• It is true, as we held in the case of Elias Beard v. The United States, (3 C. Cls.,) that we hold a party settling up a contract with public officers, in regard to public affairs, to -fuller proof of authority, and make a more rigid scrutiny into the fairness of the transaction than where parties sui juris, are acting for themselves. In that case the direct and personal interest each of the parties has in the subject matter will in ordinary cases be sufficient to guard against imposition or mistake on either side. In this case no such question arises. The contract was made under the direct authority of the Secretary of War through the department of the Quartermaster General. It was not based upon representations of the claimant, but upon the examination, inspection, and trial of the article itself, by the very officers' to whom the law had intrusted the subject-matter. Whether this knapsack was well or ill-adapted to the public service is a thing that cannot enter into our consideration in the decision of this case. That was a matter for the government to decide. They had previously bought 33,000 of the same pattern and make; 21,000 of these had been actually issued to the soldiers, and were in use on the 1st of March, 1865. When the order for these additional 5,000 was issued by the Secretary of War samples of the same were in the office. The articles made, tendered, and refused, under the contract, corresponded in every respect with the sample, and with those previously purchased.
We think the attempted annulment of the contract was unavailing to discharge the obligations assumed.by the United States under it. No officer had any such authority. The law gave no such power to any one; and any law which conferred such arbitrary power, and for *412 no just cause, would be a reproach to any people professing to be governed and controlled by principles of fairness and justice.
We are satisfied that the orders for that purpose in this case are the result of misapprehension and inadvertence, unavoidable often in the pressure and hurry incident to such times as those in which these transactions took place. The distinguished officers under whose supervision they occurred doubtless intended no injustice to any party. It is a satisfaction to us to believe that the award of damages which the facts and law of this case, as presented before us, compel us to give to the claimant will not inflict greater injury or loss upon the United States than if the knapsacks had been received and paid for. In that case, the close of the rebellion occurring at the very time of their delivery, the discharge of the great body of the army following very soon, not one, probably, of all these 5,000 knapsacks would have been needed or issued to the soldiers. It would have left just so~many more to have been sold, at the ruinous depreciation proved in this case, by the government. The loss to the United States would have been the same in either case.
According to these facts and principles the account stands thus :
5,000 knapsacks at $2 85-¿-. $14,275 00
5,000 knapsacks at 6 cents. 300 00
Balance .. 13, 975 00
And for this amouut of $13,975 judgment is to be entered in favor of claimant.